**BARRY WRIGHT CORPORATION,**
Plaintiff,

v.

**PACIFIC SCIENTIFIC CORPORATION,**
Defendant.

Civ. A. No. 78–485–S.

United States District Court,
D. Massachusetts.

Jan. 28, 1983.

Donald B. Gould, James E. McGuire, Goodwin, Procter & Hoar, Boston, Mass., for plaintiff.

John A. Nadas, Choate, Hall & Stewart, Boston, Mass., Joseph J. O'Malley, Norman A. Dupont, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant.

## FINDINGS, RULINGS AND ORDER

SKINNER, District Judge.

Plaintiff Barry Wright Corporation ("Barry") brought this action pursuant to 15 U.S.C. § 15 to recover damages for alleged violations of the antitrust laws. Plaintiff claims that defendant Pacific Scientific Corporation ("Pacific") has violated Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and Section 3 of the Clayton Act (15 U.S.C. § 14). Plaintiff also alleges an action in tort, claiming that Pacific tortiously interfered with its contractual relations.

Originally ITT Grinnell Corporation ("Grinnell") was joined as a defendant. Before trial, however, the plaintiff and Grinnell effected a settlement and Grinnell is no longer in the case as a party. The case turns on the relationships between Grinnell and Barry on the one hand, and Grinnell and Pacific on the other. Analysis of the conduct of Grinnell and its officers is pivotal to the resolution of this case.

*Findings of Fact.*

Grinnell is the country's largest producer of pipe hanger systems for nuclear power plants. The selection of such systems for a proposed plant is typically done by the firm of architects and engineers ("A & E's") who have contracted to design the plant and supervise its construction. Critical components of a pipe hanger system are the shock arresters or snubbers. These must be designed to permit the normal gradual movement of the pipes as they expand and contract in response to the superheated material which passes through them. They must, however, resist sudden movement from earthquake or explosion. Snubbers are rated by the amount of force which they can resist. The sizes of snubbers involved in this case ranged from 250 lbs. (¼ kip) to 100,000 lbs. (100 kip) sizes.

Until 1975 most snubbers were hydraulic. Grinnell made its own, which it sold at a favorable mark-up as components of its pipe hanger systems. In 1974 and 1975, hydraulic snubbers distributed by another manufacturer developed leaks. A & E's in the industry started to specify mechanical snubbers in response to anxiety over the potential danger of leaky hydraulic snubbers.

By 1975 Pacific had designed and produced an effective mechanical shock arrester which operated by a patented rotating inertial device. Pacific was only partially suc-

cessful in making independent sales to the A & E's, because the latter did not wish to carry inventories of snubbers; they wanted the pipe hanger companies to carry the inventory and release snubbers as needed during the installation of the pipe hanger system. Pacific was successful, however, in persuading the A & E's to specify mechanical snubbers to the exclusion of hydraulic snubbers. From 1975 on and during all the period material to this case, Pacific was for all practical purposes the only domestic source of mechanic snubbers. Mechanical snubbers manufactured in other countries did not meet the requirements of the Nuclear Regulatory Commission.

Pacific's share of the domestic pipe snubber market, including hydraulic snubbers, was 47% in 1976, 83% in 1977, 84% in 1978 and 94% in 1979. Pacific also makes sales of mechanical snubbers in foreign countries, but some of these sales were negotiated in the United States through local A & E's who were constructing nuclear plants abroad.

Grinnell continued to produce its hydraulic snubber (which had not leaked) to satisfy its backlog of orders. Most of Grinnell's new contracts, however, required mechanical snubbers. It attempted to design and manufacture its own mechanical snubber but was unsuccessful. It was therefore forced to buy from Pacific.

At the same time Pacific was trying to sell its snubbers directly to the A & E's as separate components, in competition with Grinnell. The quantity discount which Pacific allowed Grinnell permitted a small mark-up which was considerably less than the mark-up Grinnell had enjoyed on its own hydraulic snubbers. Grinnell set out to find another, more profitable source.

Barry had a division in California (not far from Pacific's plant) which was engaged in aerospace engineering, and had in fact produced mechanical shock absorbers for aerospace application. In 1973 it had produced a prototype snubber for use in nuclear power plants, but had decided not to enter the market and did not develop its product at that time.

Grinnell learned of Barry's prototype snubber and in late 1975 entered into negotiations with Barry to attempt to generate another source of mechanical snubbers. On January 30, 1976, Grinnell entered into a contract with Barry for the development of a mechanical snubber. The Grinnell-Barry contract consisted of two phases.

The first phase was a development phase which did not bind either party to purchase or sell snubbers. During phase one, Grinnell agreed to pay Barry $180,000 for development costs, an additional $54,000 for production tooling, and up to $60,000 for special test equipment.

On August 31, 1976, Grinnell and Barry agreed to enter into phase two of the contract. During this phase, Barry was to develop production capability for six sizes of snubbers by January 28, 1977. Grinnell was obliged to purchase its requirements of mechanical snubbers from Barry for the next three years, subject to an obligation to purchase at least $9 million but not more than $15 million over the three year period. Grinnell retained the option to purchase Barry's snubber production facilities at any time during phase two. Barry agreed not to compete with Grinnell for five years after such purchase. In addition, while Barry was manufacturing snubbers for Grinnell, it could not sell mechanical snubbers to anyone else.

The contract contained schedules for the completion and qualification (i.e., passing Grinnell's tests of conformity to specifications) of the various sizes of snubbers. Barry claims that these schedules merely reflected goals or expectations. Grinnell apparently claimed that the schedules were contract performance dates. In any case, over the next eighteen months Barry fell progressively further behind those schedules. As of January, 1977, it had not qualified any of its snubbers.

Meanwhile, Grinnell was buying snubbers from Pacific. Paul Milman, who was in charge of Grinnell's pipe hanger business, was stalling as much as possible on snubber delivery, and purchasing only the required

minimum amounts, in the hope that the Barry snubbers would soon be in production and available to Grinnell at a more favorable price. Delay became increasingly difficult, however, because of mounting pressure from Grinnell's customers for delivery of snubbers.

In the summer of 1976, Stephen Toth became president of Pacific. He observed that the number of orders that Pacific was receiving from Grinnell was considerably less than the number of mechanical snubbers that had been specified in outstanding pipe hanger contracts. He determined to have a meeting with Milman in order to create "a more healthy relationship" between the companies, i.e., get more orders from Grinnell for snubbers. Milman, Toth and Pope, the head of Pacific's Kintech Division, which manufactured snubbers, met at Pacific's plant on August 23, 1976. Toth asked Milman for an order. A further meeting was set up for August 31 at the Grinnell office in Providence, Rhode Island. Milman continued to stall on placing a large order, in the hope that Barry's snubber would soon be on line. Toth and Pope then agreed to increase the discount from the standard 20% to 30% on the four smaller sizes of snubber and 25% on the larger sizes.

With this incentive, Milman, on behalf of Grinnell, agreed to order $5.7 million worth of snubbers to cover Grinnell's expected needs for 1977. Pacific granted the additional discounts.

Milman informed Barry of this development. Barry requested that Grinnell hold off any long term orders to Pacific to give it a chance to qualify its snubbers, which it represented it could do by early 1977.

Milman then presented the issue to Coyle, the president of Grinnell. Coyle took the position that it was unnecessary to place such a large order. He preferred to rely on Barry to produce its snubber in time to meet customer demand and directed Milman to cancel the September order. Milman cancelled the $5.7 million order and placed an order for $1 million of Pacific snubbers on October 20, 1976. Pacific accordingly retracted the additional discounts

and accepted the smaller order at the standard discount.

The schedules attached to the Grinnell-Barry contract called for Barry to develop production capacity for six sizes of snubbers by January 28, 1977. As of December, 1976, it had not even produced a prototype of any size snubber which qualified under Grinnell's specification. Barry officials notified Grinnell that they could not deliver a production project before May of 1977. On January 6, 1977, Barry postponed its projected delivery date to June, 1977.

Milman became increasingly anxious about Grinnell's ability to supply its customers. He met with Pope and Toth in California in mid-December, but without significant results, partly because Pope and Toth now distrusted Milman. Toth in particular thought that he could secure more favorable orders if he could go over Milman's head to Coyle. Milman arranged a meeting in Miami on January 10, 1977 at which he, Coyle, Toth and Pope were present. No business was transacted, but they agreed to continue negotiation in California on January 27.

On January 18, Barry set back its projected delivery dates an additional two months for the smaller units and until February, 1978 for the two larger units.

On January 27, Milman and Coyle met with Toth and Pope at the Pacific plant in California. Milman went to the meeting with the expectation that Pacific would not repeat its offer of extra discounts. He was so concerned about supply, however, that he was prepared to make a substantial order at the standard discount. Nevertheless, he left the negotiations to Coyle. Coyle was initially given a tour of the Pacific plant during which he observed that a substantial portion of the facility was not being fully utilized. He was thereby encouraged to strike a hard bargain. He was right. Toth was concerned that part of his plant capacity was not productive and was particularly anxious to get the Grinnell order. Toth and Pope were also aware of the existence, though not of the terms of, the Grinnell-Barry contract, and had been since at least

September, 1976. (Their testimony that they were not in the least concerned with potential competition from Barry is not credible.)

The upshot of the negotiation was that Coyle was successful in retrieving the 25% and 30% discounts which had been offered in the aborted 1976 contract on a minimum purchase of $4.3 million during the balance of 1977 and January, 1978. The minimum purchase amount was based on Grinnell's projections of its requirements for that period. It was not in form a requirement contract, however, in that Grinnell was not barred from purchasing additional snubbers from any other source. Grinnell had the option to purchase an additional 25% of the minimum order at the same price and to purchase the same quantities at the same discounts for 1978 and 1979.

Most significantly for purposes of this case, the contract provided for a 100% penalty for cancellation of any part of the minimum order. Pope testified that this clause was included because he distrusted Milman and wanted to prevent a repeat of his experience with the aborted agreement of the previous September. In any case, the clause was readily accepted by Milman and Coyle and was not the subject of extended negotiation.

Milman returned to Providence, and on January 31, sent Barry the following letter, which he had drafted on January 25, before the meeting with Toth and Pope:

In response to your further slippage in schedules, we request an amendment of our agreement of January 30, 1976 to delete all minimum purchase requirements on ITT Grinnell from the agreement. As you know, we have issued two purchase orders to you for the first half of 1977. Since your estimated date for an initial shipment now is at least as late as September, 1977, it does not make sense for us to continue to issue purchase orders which we both now know you can't meet. An amendment deleting all minimum purchase requirements would, I believe, relieve some of the pressure on our relationship. In the alternative, we are not willing to extend the present agreed-to schedules which, in view of the market projection and our delivery commitments, we consider to be a material provision of the Agreement.

Although it is our intention to meet and discuss with you possible revisions to the Agreement between our companies, our attorneys have asked me to make it clear that these efforts looking toward amendments of that Agreement cannot change the fact that the Agreement as it now stands have been breached by your company.

We do not want our present pleasant relationship to be in any way jeopardized, but, on the other hand, we do not want to mislead you. Our willingness to work with you toward a formal Agreement amendment should not be interpreted as our acquiescence in Barry's failure to comply with existing agreement provisions.

At a meeting on February 25, 1977 with Barry officials, Milman stated that due to the development delays he might have to commit the next two years' purchases to Pacific. Milman proposed to reduce the minimum purchase requirement to $3.6 million. As an alternative, Barry proposed to "stretch-out" the $9 million minimum purchase requirement over a longer term. The issue was not resolved. Milman encouraged Barry to continue its development efforts and set May 15, 1977 as a deadline by which Barry had to qualify the four smaller snubbers and complete the design of the two larger sizes, if they were to get any purchases from Grinnell. Another meeting was held on March 14, 1977, but again no resolution was reached. I find that Milman hoped to keep Barry in the picture as an alternative source rather than become wholly dependent upon Pacific.

On April 25, 1977, David McKenny, vice-president and general counsel of Grinnell, wrote Barry a letter containing the following paragraph:

I would like to make it clear that the May 15th date was only important in that the amendment we offered would not

take effect unless the qualifications we have been discussing were accomplished by that date. We would not want you to believe that, if Barry Wright accomplishes the qualifications referred to by May 15, ITT Grinnell would be obligated to continue under the original Agreement. While we are always willing to discuss with you agreements under which our two companies could proceed, our present position is that the original Agreement is breached and terminated.

By May 15, Barry had qualified the four smaller sized snubbers.

On May 16, several Grinnell representatives met with John Quinn, president of Barry, and Milt Gilbert, Barry's legal counsel. They discussed their future relationship but reached no agreement. They agreed to meet again on May 27.

On May 23, Milman called Quinn to postpone the scheduled meeting. Milman informed Quinn that he planned to meet with Toth and Pope in Chicago. Milman also told him that the price difference between Pacific and Barry was still over 10% but that if the differential fell below 10%, it would not be attractive to stay with Barry.

On May 31, 1977, Milman met with Pope and Toth in Chicago and agreed to purchase orders of $6.9 million for 1978 and, subject to further negotiation on escalation, the same amount for 1979. Both of these contracts provided for the extended discounts of 25% and 30% and for a 100% penalty for cancellation. In the 1979 Agreement, the cancellation penalty applied only to $5 million of the order.

On June 2, 1977, Grinnell cancelled the two purchase orders it had placed with Barry in September, 1976, upon which Barry had failed to deliver. On July 5 and July 14, 1977, Grinnell placed with Pacific the orders for 1978 and 1979, respectively, which Milman had agreed to on May 31.

I find that as of July, 1977, Barry had qualified one each of its sample snubbers in the four smaller sizes, but that their performance was still unreliable. The problems of putting even the four smaller sizes into production had not been solved. A critical element of the snubber was a ball screw. Ball screws which were commercially available had to be individually machined to be adapted to the Barry snubbers. No supplier of a ball screw suitable for production runs had been located. Engineering for the 35,000 lb. and 100,000 lb. snubbers, which presented different and more serious problems than the smaller sizes, had not been addressed at all. I am not persuaded by a preponderance of the evidence that Barry had the capacity to produce and deliver a full line of mechanical snubbers before the end of 1979.

The minimum amounts under the agreements for 1978 and 1979 were less than Grinnell's 1977 projections of its requirements for those years, and for 1979 substantially less. In fact, however, Grinnell's purchases were only slightly in excess of the minimum amounts.

All of Pacific's discounted prices were above both marginal and average cost, and Pacific made a substantial profit on the Grinnell sales. It enjoyed some savings in mass production and reduction of selling costs. With a few exceptions, its prices in all sizes of snubbers were higher than Barry's contract prices (including escalation). (It is likely, however, that if Barry had even gotten into production on the larger sizes, its increased development costs would have precluded them from selling at the contract price, and increases would have been required to make such production profitable).

At the conference on May 31, 1977, Pope and Toth agreed that 1977 prices would increase only 5% over the 1976 price list, that 1978 prices would be the same as 1977 and that 1979 prices would increase at the rate of inflation. The evidence does not support the proposition that this price structure was arrived at for the purpose of securing the contract with Grinnell; it is likely that it had been decided upon across the board, possibly as early as January, 1977.

The evidence does not support a finding that as part of the agreement, Pacific agreed not to solicit Grinnell's "backlog", i.e., existing unfilled orders for pipe hanger

systems with hydraulic snubbers in order to get the customer to substitute its mechanical snubbers. The evidence is rather persuasive, in fact, that Pacific actually made such solicitations.

At a meeting of the Society of Security Analysts in New York in the fall of 1977, Mr. Toth, president of Pacific, made the following answer to a question concerning Pacific's competitors in the snubber business:

> TOTH: Shock arrestor. Well, our major competitors are our major customers. We traditionally sell the shock arrestors to the pipe hanger people and for instance, there's a division of ITT, Grinnell up in Providence, called the Pipe Hanger Division, that probably has a major share of the market and they make hydraulic shock arrestors. So we have had to sell our product to them when at the same time they were trying to beat us out with the sale of their hydraulic units. And that's the reason for our selling directly to the utilities. We went right to the end user who just edicted [sic] to the selling engineers that they wanted a mechanical shock arrestor versus a hydraulic. So Grinnell has had to buy our unit. We really were heading on a collision course with this major customer up until last fall when we got together with them and they decided not to offer their unit nor to get into the design of a mechanical unit. So we now have all of their business. We have a contract with them for the next two years. That amounted to a $16 million order that we got this past summer and it is a major part of our backlog now and they are our friends now.

In October, 1977, a Grinnell internal memorandum seeking approval from corporate headquarters for the cancellation of the Grinnell-Barry contract contained the following paragraph:

> During the course of developing the product, Barry Wright Corp. (our partners in the joint venture) exercised their option to increase production costs due to escalation. At the same time our competitors, who have a similar device qualified and in

production, have heard of our intent to develop our own device, offered us more favorable terms for both cost and schedules. With these new terms, the cost of developing our own product became marginal, and the project was cancelled.

This memo was endorsed by Milman and other Grinnell officials principally concerned with the snubber contract.

Pacific sent Barry a letter warning Barry against infringing Pacific's patent. No other action was taken. I find that this letter was sent in good faith and did not constitute an abuse of the patent.

*Rulings of Law.*

1. *Relevant Market.*

In order to determine whether the defendant has "market power" it is necessary to determine the relevant market. The parties have stipulated that the relevant product market consists of both hydraulic and mechanical snubbers. This is theoretically justifiable even though customer preference was strongly in favor of mechanical snubbers on the ground that there is a point at which a price differential would negate the preference. As a practical matter, however, given the relationship of engineering performances to budgetary limits in this particular industry, it is probable that it would take a very broad price differential to achieve this theoretical result.

Defendant urges that the relevant geographic market is the entire world because Pacific makes some sales in foreign countries in competition with foreign manufacturers. The market in which Grinnell is obliged to buy and in which Barry was obliged to compete for Grinnell's business was the United States. In the United States market, Pacific was not subject to competition from foreign manufacturers. The world market is thus irrelevant to this case. The relevant market is the United States. *See generally,* Areeda & Turner, *Antitrust Law,* Little, Brown and Company, 1978, §§ 522–524 and 534.

2. *Market Power.*

Market power is defined as the power to raise the price of a product by limiting its

supply. There was evidence of various arcane indicia of market power which in the circumstances of this case I need not review. Pacific's dominance of the market generally and total control of mechanical snubbers in the United States clearly gave it market power. In addition, there were significant barriers to entry into the market because of the patent covering Pacific's product and the cost and difficulty of designing and producing a workable snubber which did not infringe the patent.

The possession of market power is not the equivalent of its exercise, however. It appears in this case that Pacific considered it in its best interests (i.e., presumably the maximization of profits) to reduce prices and increase production in order to utilize its total investment in its productive capacity. This is the reverse of the exercise of market power.

### 3. *Exclusionary Conduct.*

■ A manufacturer with market power may not indulge in exclusionary conduct, even if such conduct is not the classic monopolistic exercise of market power. Exclusionary conduct has been very broadly defined, most notably by Judge Wyzanski in *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 343–345 (D.Mass. 1953), aff'd *per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), as encompassing any practices by a monopolist which were not the "inevitable consequences of ability, natural forces or law". "[M]arket control is inherently evil and constitutes a violation of § 2 [of the Sherman Act] unless economically inevitable, or specifically authorized and regulated by law."

Barry has asserted that Pacific's conduct was violative of the Sherman Act in several particulars; only two of its arguments merit serious consideration.

■ The first argument is that the price concessions granted to Grinnell, while not predatory in the sense of violating the Robinson-Patnam Act, were nevertheless exclusionary in that they were designed to eliminate Barry as a potential competitor. They were not below any measure of cost,

however, and produced a comfortable profit for Pacific. Assuming that the price concessions were in part an answer to the potential threat from Barry, I rule that such nonpredatory and nondiscriminatory price reductions do not violate Section 2 of the Sherman Act. Reasonable reduction of price in response to competition is not a violation of the Sherman Act; it is in fact the result which the antitrust laws were designed to accomplish. *Cal. Computer Products v. Intern. Business Machines,* 613 F.2d 727, 742 (9th Cir.1979).

■ The second argument is that, in exchange for price cuts, Pacific imposed on Grinnell a three-year noncancellable requirements contract which was intended to foreclose Barry's entry into the market. The first answer to that argument is that it misread the facts. There was no three-year contract. Pacific offered three separate contracts at favorable discounts. The favorable discounts for 1977 were not conditioned on agreements for 1978 and 1979, nor were 1978 discounts conditioned on an agreement for 1979. Accepting all three contracts was Grinnell's choice, apparently for two reasons: relatively favorable pricing and established availability of a reliable product.

Even if the contracts were requirements contracts, separate one-year contracts in these circumstances are probably not unreasonable. It is not necessary to decide that issue, however, because it seems clear that the agreements were not for requirements but for specific dollar amounts. In 1978 and 1979, the minimum amounts were less than Grinnell's anticipated needs. Barry argues that in fact the minimum amounts were in excess of Grinnell's requirements and that Grinnell ended up with an excessive inventory of snubbers for which there was no economic justification. There was little if any evidence on the justification for Grinnell's inventory, and I am unable to make a finding on the point. A characteristic of a requirements contract is that the purchaser is precluded from buying any of the product from any other supplier. This

was not the case, and indeed Barry might have supplied the excess amount if it had taken up the $3.6 million option offered to it by Grinnell in the spring of 1977.

The aspect of the contracts which most strongly supports Barry's charges against Pacific is the 100% cancellation penalty, in effect rendering the purchase order noncancellable. It is difficult to say that this provision was "economically inevitable". It was in fact a change in practice. Pacific argues that it simply made specifically enforceable Grinnell's contractual obligation to purchase the minimum amount specified. This argument is a trifle disingenuous. It is clear that blanket purchase orders of the type executed by Pacific and Grinnell in January and July, 1977 were agreements governing price only. No firm obligations of the seller to deliver and the buyer to pay for the goods arose until specific purchase orders were submitted. If the agreed upon minimums were not ordered, the agreed upon discounts would be withdrawn, and the purchaser would be obliged to pay at standard rates for products actually ordered and delivered.

■ Strict application of the notion of "economic inevitability", however, would render a whole range of business choices illegal to the extent that a particular choice enhanced the chooser's control of the market in any respect. It seems to me to be an extraordinary extension on antitrust theory to hold a noncancellable clause in a one-year purchase contract illegal because not economically inevitable. I have found no case so holding, and I rule that the imposition of this clause, given the history of the relations between Grinnell and Pacific, and Pacific's legitimate desire to plan its production for at least a year, is not illegal exclusionary conduct in violation of § 2 of the Sherman Act.

*Tortious Interference with Contractual Relations.*

■ Barry had added a count against Pacific for tortiously interfering with its contract with Grinnell. With respect to this count, I find and rule as follows:

1. From January, 1977 onward Barry was in default on its contract with Grinnell and there was no likelihood that Barry could produce a line of snubbers within any future period reasonably within the terms of the contract.
2. Pacific did not commit any tortious act.

*Conclusion.*

I conclude that Pacific had achieved market power in the snubber market generally and a complete monopoly of mechanical snubbers in the United States as of January, 1977. I find that the United States is the relevant geographical market. I further find that Pacific's monopoly was achieved because of its superior skill in devising the only workable and reliable mechanical snubber on the market and because of the protection offered to it by its patent. Its monopoly was thus perfectly legal. I conclude that in 1977 it captured an even larger share of the market by means of three successive one-year contracts with Grinnell for substantial numbers of snubbers. I do not find that the provisions of these contracts were illegal. I further conclude that it is likely that Pacific would have captured most of this market in any event because Barry was not shown to have the ability to produce a full line of snubbers within the relevant period and no other producer was in the field.

I conclude that Barry's elimination from the market was primarily the result of its inability to furnish the product within the relevant time period, and that Pacific's domination of the market was the result of its filling the void thus created. In that sense, its eventual monopoly position was economically inevitable.

*Order for Judgment.*

On the basis of the foregoing, judgment shall enter for the defendant, with costs.

So ordered.