# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3325

_____

| | | |
|---|---|---|
| Southeast Missouri Hospital, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Saint Francis Medical Center, | * | |
| | * | |
| Plaintiff-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| C.R. Bard, Inc., | * | |
| | * | |
| Defendant-Appellee, | * | |
| | * | |
| Tyco International, US, Inc.; Tyco | * | |
| Health Care Group; John Does 1-10, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| ---------------------------- | * | |
| | * | |
| Attorney General of the State of | * | |
| Missouri, | * | |
| | * | |
| Amicus on Behalf of | * | |
| Appellant. | * | |

_____

Submitted: June 15, 2010
Filed: August 17, 2010

_____

Before MURPHY, BEAM, and BENTON, Circuit Judges.
_____

BENTON, Circuit Judge.

Saint Francis Medical Center brought this class action suit against C.R. Bard, Inc., a supplier of medical equipment, including Foley and intermittent catheters. According to Saint Francis, Bard's contracts with Group Purchasing Organizations violate sections 1 and 2 of the Sherman Act, section 3 of the Clayton Act, and Missouri antitrust law. *See* **15 U.S.C. §§ 1, 2**; **15 U.S.C. § 14**; **Mo. Rev. Stat. § 416.031** (2000). Saint Francis seeks relief under sections 4 and 16 of the Clayton Act, and Missouri law. *See* **15 U.S.C. §§ 15, 26; Mo. Rev. Stat. § 416.121.1** (2000). The district court[1] granted summary judgment to Bard. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Saint Francis Medical Center, a hospital in Cape Girardeau, is a member of Novation, a Group Purchasing Organization. GPOs negotiate standard contracts with suppliers on behalf of member hospitals. GPO membership is voluntary. Hospitals can (and do) switch from one GPO to another, and may belong to multiple GPOs. GPOs do not purchase supplies; member hospitals do, under the terms of GPO-negotiated contracts. GPO contracts with suppliers typically last three to eight years, and may be terminated by either side, with notice. Once a GPO contracts with a supplier, its member hospitals may sign letters of commitment, accepting the terms of the GPO contracts. A member hospital's commitment may be terminated at any

---

[1]The Honorable Thomas C. Mummert, III, United States Magistrate Judge for the Eastern District of Missouri. The parties consented to trial before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), with direct review to this court.

time, with notice to the supplier.[2]  According to the parties, 96 to 98 percent of all hospitals in the United States belong to one or more GPOs.

GPO-member hospitals are not required to purchase through their GPO contracts.  GPO-member hospitals can purchase supplies, like catheters, "off-contract," negotiating their own prices with suppliers.  Hospitals purchasing off-contract may pay increased prices, as they forgo the discounts in their GPO contracts.  On average, hospitals pay 16 percent less by buying under GPO contracts.

Bard sells medical supplies, including catheters.  Bard is the leading supplier of Foley catheters in the United States.  From 2003 through 2008, Bard made 86.7 percent of Foley sales to hospitals.  Bard also has a significant share of the market for intermittent catheters.[3]

Saint Francis purchases Bard's catheters, pursuant to their GPO's contracts with Bard.  According to Saint Francis, Bard abuses its dominant position in the catheter market in contracting with GPOs, inflating prices for hospitals.  Specifically, Saint Francis objects to sole-source provisions, tiered pricing, and bundled discounts in Bard's GPO contracts.

Bard prefers sole-source contracts with GPOs.  In sole-source contracts, Bard is the only supplier of catheters listed on the GPO price list provided to member hospitals, and thus the only seller under the terms in the GPO contract.  In addition,

---

[2]For the GPO contract between Novation and Bard for 2005 through 2008, the Acute Urologicals Letter of Commitment – covering catheters – states: "Member reserves the right to terminate this letter of commitment at any time upon notice to Bard."

[3]According to Bard, its market share for intermittent catheters between 2003 and 2006 was 34 percent.  Saint Francis counters that Bard's share of intermittent catheter sales *under GPO contracts* exceeded 60 percent from 2003 to 2008.

according to Saint Francis, Bard's sole-source contracts with one GPO (Novation) from 2001 to 2005 urged participating member hospitals not to solicit proposals from Bard's competitors or conduct product evaluations of competitors' products. As the district court found, "there is 'fierce competition' for sole-source contracts." Hospitals that buy Bard catheters under sole or dual-source contracts generally pay less than hospitals that do not. Even under sole-source agreements, however, member hospitals may purchase off-contract.

Several of Bard's GPO contracts include tiered pricing: hospitals get bigger discounts for purchasing higher percentages of supplies from Bard. The largest discounts go to hospitals that buy at least 85 percent of certain listed products from Bard. None of the GPO contracts give hospitals a discount for buying Bard catheters exclusively.

The GPO contracts also offer discounts to hospitals buying other Bard medical supplies along with catheters. These "bundled discounts" allow hospitals to pay a lower price for several medical products purchased together than when purchased separately. Bundles in the GPO contracts include catheters and related products, like drainage bags and urine meters.

After both Saint Francis and Bard moved for summary judgment, the district court ruled for Bard.

## II.

This court reviews the district court's grant of summary judgment de novo. *See, e.g.*, **Amerinet, Inc. v. Xerox Corp.**, 972 F.2d 1483, 1489-90 (8th Cir. 1992). A grant of summary judgment is appropriate only where the record, read most favorably to the non-moving party, indicates that "no genuine issues of material fact exist . . . and the moving party is entitled to judgment as a matter of law." **Fed. R. Civ. P.**

**56(c)**; *see also* ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322-23 (1986). There is no different or heightened summary judgment standard in complex antitrust cases. *See* ***Amerinet***, 972 F.3d at 1490.

According to Saint Francis, Bard's sole-source GPO contracts, tiered pricing, and bundled discounts unreasonably restrain trade in violation of the Sherman Act, the Clayton Act, and Missouri antitrust law.[4] *See* **15 U.S.C. §§ 1, 2**; **15 U.S.C. § 14, 15, 26**; **Mo. Rev. Stat. § 416.031** (2000). Saint Francis's theory is that, while hospitals (even those participating in sole-source GPO contracts) may purchase catheters from other suppliers, Bard's GPO contracts are *de facto* exclusionary because the discount prices are so attractive that hospitals cannot afford to forgo them. *See* ***Concord Boat Corp. v. Brunswick Corp.***, 207 F.3d 1039, 1058 (8th Cir. 2000) (claims under Section 1 of the Sherman Act "that allege only de facto exclusive dealing may be viable.").

Saint Francis must establish "an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages." ***Amerinet***, 972 F.2d at 1490. *See also* ***Iverson v. Pfizer, Inc. (In re Canadian Imp. Antitrust Litig.)***, 470 F.3d 785, 791 (8th Cir. 2006) ("Unlike a governmental entity, . . . a private plaintiff must demonstrate that [it] has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants, and that [it] has standing to pursue a claim under the federal antitrust laws.); *id.* ("Injunctive relief under § 16 of the Clayton Act is likewise available only to plaintiffs who have suffered an injury cognizable under § 4."); ***Cargill, Inc. v. Monfort of Colorado, Inc.***, 479 U.S. 104, 122 (1986) ("We hold that a plaintiff seeking injunctive relief under § 16 of the Clayton Act must show a threat of antitrust injury, and that a showing of loss or damage due merely to increased competition does not constitute such injury.").

---

[4]Missouri antitrust statutes are construed "in harmony with ruling judicial interpretations of comparable federal antitrust statutes." **Mo. Rev. Stat. § 416.141** (2000).

"The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. United States Petroleum Co.*, 495 U.S. 328, 344 (1990). "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262-63 n.14 (1972).

The "Supreme Court has urged great caution and a skeptical eye when dealing with unfair pricing claims." *Concord Boat*, 207 F.3d at 1060 (internal quotations omitted). This is because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atlantic Richfield,* 495 U.S. at 340. "Hence, they cannot give rise to antitrust injury." *Id.* The Supreme Court has "adhered to this principle regardless of the type of antitrust claim involved." *Id.*

> When prices are not predatory, any losses flowing from them cannot be said to stem from an anticompetitive aspect of the defendant's conduct. It is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.

*Id.* at 340-41 (internal quotations omitted). *See also Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) (noting that the Court has "rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws," and reasoning that it "is beyond the practical ability of a judicial tribunal to control [above-cost discounting] without courting intolerable risks of chilling legitimate price cutting."); *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, ___ U.S. ___, 129 S. Ct. 1109, 1120 (2009) ("Recognizing a price-squeeze claim where the defendant's retail price remains above cost would invite the precise harm we sought to avoid in *Brooke Group*: Firms might raise their retail prices or refrain from aggressive price competition to avoid potential antitrust liability."); *Cargill*, 479

U.S. at 116 ("To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition.").

"Predatory pricing occurs when a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in." *Concord Boat*, 207 F.3d at 1061 n.13 (internal quotations omitted). "If a firm has discounted prices to a level that remains above the firm's average variable cost, 'the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive.'" *Id.* at 1061, *quoting Morgan v. Ponder*, 892 F.2d 1355, 1360 (8th Cir. 1989). "[P]rices above average total cost are legal *per se*." *Morgan*, 892 F.2d at 1360. In other words, the general rule is "that above cost discounting is not anticompetitive." *Concord Boat*, 207 F.3d at 1061. *See also Atlantic Richfield,* 495 U.S. at 340; *linkLine*, ___ U.S. at ___, 129 S. Ct. at 1116 (listing "two established requirements for predatory pricing: below-cost retail pricing and a 'dangerous probability' that the defendant will recoup any lost profits."), *citing Brooke Group*, 509 U.S. at 222-24.

Here, Saint Francis's only contention that Bard discounted anything below cost involves the bundled discounts. According to Saint Francis, "Bard's system of providing rebates for 'bundles' of Bard's products prevented competitors who did not produce a full line of products from competing for the catheter business on the merits because such competitors could not offer comparable bundles or offer the same type of rebates because they would have to effectively offer some 'bundled' products below cost."

Saint Francis urges that bundled discounts can "coerce buyers . . . when no rival can readily assemble a comparable package." 3A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW § 749, at 327 (3d ed. 2008). "[A] package that is nominally 'above cost' can coerce when the only way the rival can match the discount is to give an even larger per-item discount." *Id.*

> To see whether a package price is 'exclusionary' in this sense, then, one simply attributes the entire discount on all products in the package to the product for which exclusion is claimed. If the resulting price is less than the defendant's cost, then the package discount is exclusionary as against a rival who makes only one of the two goods in the package.

*Id.* at 328-29. "The attribution test is essential to analyzing claims of package discounts because, as in the case of single-product predatory pricing, only an effective price that is 'below cost' can exclude an equally efficient rival." AREEDA & HOVENKAMP § 749, at 330.

The Ninth Circuit adopted the attribution test (although it is unclear whether it still recognizes that test). *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 906-07 (9th Cir. 2008) (adopting the attribution test); *Doe v. Abbott Labs.*, 571 F.3d 930, 935 (9th Cir. 2009) ("Because we believe the outcome here follows from *linkLine*, we need not discuss *Cascade*'s impact on this case . . . ."); *linkLine*, ___ U.S. at ___, 129 S. Ct. at 1120 ("Recognizing a price-squeeze claim where the defendant's retail price remains above cost would invite the precise harm we sought to avoid in *Brooke Group*: Firms might raise their retail prices or refrain from aggressive price competition to avoid potential antitrust liability."). Even assuming this court recognizes the attribution test, it does not help Saint Francis.

Saint Francis relies on its expert's report, which concludes that Bard's bundled discounts fail the attribution test. But the report is fatally flawed. First, the attribution test is inappropriate where competitors offer all of the products packaged by the

defendant. *See id.* at 310, 324. Here, at least three of Bard's competitors sell the full line of products associated with urological catheters. Second, assuming the attribution test is appropriate, Saint Francis's expert applied it incorrectly. Instead of attributing "the entire discount on all products in the package to the product for which exclusion is claimed" – here, catheters – Saint Francis's expert attributed the discounts to the other products in the bundle, like drainage bags and urine meters. *See id.* at 328. *See also* ***Cascade***, 515 F.3d at 906 n.15 (illustrating the test by attributing the entire package discount of a firm making shampoo and conditioner, to only shampoo in order to determine whether the discount excludes a rival making only shampoo). Saint Francis's claim is that Bard's bundled discounts exclude non-full-line competitors from the *catheter* market, not from the drainage bag or urine meter markets. In addition, this court notes that the GPO contracts exempt suppliers who do not offer a full line of urological products from discount calculations.[5]

No evidence suggests that Bard's catheter prices are, actually or effectively, discounted below cost. Saint Francis cannot demonstrate an antitrust injury caused by the GPO contracts. *See* ***Atlantic Richfield***, 495 U.S. at 340 ("[S]o long as [low prices] are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury."). *See also* ***Concord Boat***, 207 F.3d at 1057-63; ***Allied Orthopedic Alliances Inc. v. Tyco Health Care Group LP***, 592 F.3d 991, 996-98 (9th Cir. 2010).

In *Concord Boat*, boat builders brought Sherman Act challenges against engine-supplier Brunswick for its discount program, claiming it was an attempt "to erect and maintain barriers to entry and to place its customers in 'golden handcuffs,' such that boat builders and dealers had no choice but to purchase engines from it." 207 F.3d at

_____

[5]For example, the product supplier agreement between Novation and Bard for 2005 through 2008 states: "Purchases from a supplier that does not offer the full product line will not count against the Member's compliance level."

1060. This court reversed a judgment for the boat builders, noting that "customers were not required either to purchase 100% from Brunswick or to refrain from purchasing from competitors in order to receive the discount," and that customers "were free to walk away from Brunswick's discounts at any time." *Id.* at 1063. This court concluded that the plaintiffs "did not establish antitrust injury or causation with respect to either Sherman Act claim." *Id. See also id.* at 1060 ("The boat builders have not shown that a reasonable jury could have found that Brunswick's [discount pricing] programs, which were not exclusionary, caused harm in the first instance, or that they were a 'material cause' of any harm allegedly suffered."). Here, as in *Concord Boat*, member hospitals under sole-source GPO contracts were not required to purchase 100 percent from Bard or to refrain from purchasing from competitors to receive discounts, and were free to walk away.

In *Allied Orthopedic*, plaintiff hospitals argued that sole-source provisions and tiered pricing in Tyco's GPO contracts violated the Sherman Act and inflated prices for Tyco's pulse oximetry sensors. 592 F.3d at 993-994. The plaintiffs, relying on their expert's foreclosure analysis, advanced a *de facto* exclusion argument similar to Saint Francis's argument in this case. *See id.* at 997 ("Plaintiffs' expert . . . testified that Tyco's agreements foreclosed a substantial share of the U.S. sensor market by providing 'an incentive as opposed to a requirement for exclusivity.'"). The district court granted summary judgment to Tyco. The Ninth Circuit affirmed, emphasizing that "the market-share discount and sole-source agreements in this case did not contractually obligate Tyco's customers to purchase anything from Tyco." *Id.* at 996. The court noted that the plaintiffs' expert "never explained why price-sensitive hospitals would adhere to Tyco's market-share agreements when they could purchase less expensive generic sensors instead." *Id.* at 997. "At any time, a GPO member could simply forego the negotiated discounts with Tyco and purchase less expensive generics instead." *Id.*

Saint Francis, relying on expert reports, argues that the provisions at issue have foreclosed substantial percentages of the market for Foley and intermittent catheters, injuring it through higher prices and reduced availability of competitors' products. *See, e.g.,* ***Blue Shield of Va. v. McCready***, 457 U.S. 465, 482-83 (1982) ("[A]n increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which [15 U.S.C.] § 4 potentially offers redress."). But, like the hospitals in *Allied Orthopedic*, Saint Francis's GPO membership, and its participation in GPO programs, are voluntary. *See **Allied Orthopedic***, 592 F.3d at 997 ("At any time, a GPO member could simply forego the negotiated discounts with Tyco and purchase less expensive generics instead."); *id.* (noting that plaintiffs' expert "never explained why price-sensitive hospitals would adhere to Tyco's market-share agreements when they could purchase less expensive generic sensors instead."). As the district court noted, Saint Francis's director of materials management "testified that, although Tyco has lower prices, he purchased from Bard *because the hospital physicians prefer its products*." (Emphasis added). He also acknowledged that he is willing to negotiate, and has negotiated, off-contract contracts directly with suppliers. Saint Francis has not suffered any injury caused by the GPO contracts.

## III.

The judgment of the district court is affirmed.

_____